UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

PLASTECH HOLDING
CORPORATION,

    Plaintiff/Counter-Defendant,

v.

WM GREENTECH AUTOMOTIVE
CORPORATION, et al.,

    Defendants,

&

JAC MOTORS,

    Defendant/Counter-Plaintiff.
_____/

Case No. 14-cv-14049

HON. MARK A. GOLDSMITH

**OPINION & ORDER**
**GRANTING DEFENDANTS' MOTIONS FOR SANCTIONS (Dkts. 163, 165) AND DISMISSING PLAINTIFF'S CLAIMS WITH PREJUDICE**

This matter is before the Court on Defendants' respective motions for sanctions (Dkts. 163, 165). Defendants contend that Plaintiff Plastech Holding Corporation ("PHC") engaged in bad-faith conduct by fabricating evidence and submitting it to this Court as an exhibit to the first and second amended complaints. A hearing on these motions was held on March 17, 2017. For the reasons stated below, the Court grants the motions and dismisses PHC's claims with prejudice.

## I. BACKGROUND

PHC is a corporation that imports, distributes, and develops products for motor vehicles. 3d Am. Compl. ¶ 20 (Dkt. 113). According to PHC, it began working with Defendant JAC

1

Motors,[1] a Chinese original equipment manufacturer of automobiles, in 2009, to assist JAC Motors in readying passenger vehicles for distribution and sale in the United States. Id. ¶¶ 21, 25.

PHC alleges that it and JAC Motors executed a Framework Agreement on October 27, 2010, which gave PHC the exclusive right to distribute JAC Motors' passenger vehicles in the United States. Id. ¶¶ 29-31. Along with its first amended complaint (Dkt. 26), which was filed on December 12, 2014, PHC filed a purportedly signed version of that Framework Agreement as an exhibit under seal. See Framework Agreement, Sealed Ex. A to 1st Am. Compl. (Dkt. 27). Shortly thereafter, on February 11, 2015, PHC filed its second amended complaint (Dkt. 35), which attached that signed version of the Framework Agreement again, this time unsealed, see Framework Agreement, Ex. A to 2d Am. Compl. (Dkt. 35-1), asserting that it was a "true and correct copy of the [Framework] Agreement," 2d Am. Compl. ¶ 29.

The parties also executed a Framework of Cooperation Agreement ("Cooperation Agreement") on the same day as the Framework Agreement, see Cooperation Agreement, Ex. 17 to JAC Motors Mot. for Sanctions (Dkt. 163-18).[2] In January 2011, Julie Brown, PHC's founder and former chief executive officer, traveled to Hefei, China, where the parties executed a Supplementary Agreement. See Supplementary Agreement, Ex. 16 to JAC Motors Mot. (Dkt. 163-17). Later actions by Ms. Brown, who died in January 2016, figure prominently in the disposition of this case.

---

[1] JAC Motors is also known as Anhui Jianghuai Automobile Co., Ltd., see 3d Am. Compl. ¶ 1, but, for purposes of this opinion and order, the Court will refer to Defendant simply as JAC Motors.

[2] Notably, the Cooperation Agreement did not contain any provision on exclusivity.

PHC initiated this action on October 21, 2014 against only Defendants WM GreenTech Automotive Corporation, GreenTech Automotive Corporation, and GreenTech Automotive, Inc. (collectively referred to as "GreenTech"),[3] asserting claims for tortious interference, civil conspiracy, and unjust enrichment, based on GreenTech allegedly having entered into a distribution agreement with JAC Motors despite knowing that PHC had an exclusive relationship with JAC Motors. See generally Compl. (Dkt. 1). JAC Motors then sought to intervene in this matter and, following a telephonic status conference with the Court, the parties agreed to PHC filing its second amended complaint, which named JAC Motors as a defendant. See Plastech Holding Corp. v. WM GreenTech Auto. Corp., No. 14-cv-14049, 2016 WL 3536749, at *1 (E.D. Mich. June 29, 2016).

Almost two years after the filing of the initial complaint and nearing the end of discovery, see 6/16/2016 Order at 2 (Dkt. 99) (fact discovery to be completed by September 26, 2016), PHC filed a third amended complaint on September 22, 2016.[4] That pleading removed the Framework Agreement as an exhibit and alleged that JAC Motors "kept the signed copy of the [Framework] Agreement and PHC does not have an executed copy of the Agreement." 3d Am. Compl. ¶ 29. Prior to that filing, counsel for PHC emailed the proposed third amended complaint to counsel for Defendants, asking them to "please let us know whether you'll consent to PHC's filing the attached complaint, or plan to contest the filing . . . ." 9/9/2016 Email, Ex. 3 to Pl. Resp. to JAC Motors Mot. for Sanctions (Dkt. 194-5). That email did not explain why PHC was removing the

---

[3] In its answer to the third amended complaint, GreenTech states that WM GreenTech Automotive Corporation is now known as WM Industries Corporation, and that GreenTech Automotive Corporation is no longer in existence after merging with Advanced Composite Technology, Inc. See Answer ¶¶ 10, 11 (Dkt. 116).

[4] On September 26, 2016, after the third amended complaint had been filed, the parties stipulated to extending the period for fact discovery to December 7, 2016. See 9/26/2016 Stip. & Order (Dkt. 114).

3

Framework Agreement as an exhibit. Nor did it suggest that there were any irregularities with its signed version of the Framework Agreement, which PHC had previously filed.

In November 2016, following the depositions of James Brown (Ms. Brown's husband and PHC's current chief executive officer) and Kerrie Mitchell (PHC's former chief information officer), Defendants claim they have discovered that the signed Framework Agreement PHC relied on in this case was fabricated. This revelation formed a significant portion of Defendants' motions for summary judgment, as well as their motions for sanctions.

The fabrication, which PHC acknowledges, is established by the following record evidence in this case. On August 29, 2011, Judy Hayes (PHC's office manager) emailed Mitchell two documents. The first document is the last page of an unknown agreement that contained signatures from JAC Motors and PHC, while the second document was a copy of the last page of the Framework Agreement without signatures. 8/29/2011 Email from Hayes to Mitchell, Ex. 5 to JAC Motors Mot. for Sanctions, at 2 (cm/ecf page) (Dkt. 163-6) (PDF attachments to email are entitled, "JAC Motors.pdf" and "JAC Motors (no signatures).pdf").[5] During her deposition, Mitchell testified that she electronically copied the signatures from the first document and pasted them into the second document. Mitchell Dep. Tr., Ex. 15 to JAC Motors Mot. for Summ. J., at 30-31 (Dkt. 144-16). According to Mitchell, Ms. Brown asked Mitchell to create this new document with signatures because Ms. Brown "wanted to have a nice, clean document to show the dealers and help increase creditability [sic]." Id. at 26-27.

---

[5] The two signature pages are also different for two other visually obvious reasons. First, PHC is referred as "PHC" in the first document above the signed representative signature block, as opposed to its reference as "Plastech" in the second document above the unsigned representative signature block. Second, the first document contains only one paragraph, which is entitled "18. Execution," whereas the second document contains two paragraphs, the first of which is entitled "17. Address and contact information," followed by "18. Execution."

Mitchell then emailed the newly created document with the copied signatures to Hayes, see 8/29/2011 Email from Mitchell to Hayes, Ex. 6 to JAC Motors Mot. for Sanctions, at 2 (cm/ecf page) (Dkt. 163-7) (attachment entitled, "JAC Motors_merged.png," and asking Hayes, "Can you print this out – see how it looks?"), who then emailed a copy of the entire Framework Agreement, which incorporated the newly created signature page, to Mr. Brown and Mitchell later that same day, see 8/29/2011 Email from Hayes to Mr. Brown & Mitchell, Ex. 7 to JAC Motors Mot. for Sanctions (Dkt. 163-8) (PDF attachment entitled, "Framework Agreement – JAC Motors & Plastech Holding Co. (Oct. 27, 2010).pdf").

JAC Motors states that PHC emailed the fabricated document to third parties as proof of the alleged exclusive relationship and "gain credibility, potential financing, and dealer relationships. . . ." JAC Motors Mot. for Summ. J. at 15 (Dkt. 144) (citing 11/9/2013 Email, Ex. 12 to JAC Motors Mot. for Summ. J. (Dkt. 144-113); 7/2/2014 Email, Ex. 13 to JAC Motors Mot. for Summ. J. (Dkt. 144-14); 8/21/2013 Email, Ex. 14 to JAC Motors Mot. for Summ. J. (Dkt. 144-15)); see also id. at 7 (stating that the purpose of the "prettied-up" document was for PHC "to gain credibility and induce dealers to make investment and distribution decisions regarding the sale of JAC Motors['] vehicles in the United States"). PHC has not denied that. See PHC Resp. to JAC Motors Mot. for Summ. J. at 6 (Dkt. 171).

It is this fabricated document, later attached to the pleadings in this action, that forms the basis for dismissal of this case.

## II. ANALYSIS

Federal courts have the inherent authority to sanction bad-faith conduct, as well as conduct that is "tantamount to bad faith." Metz v. Unizan Bank, 655 F.3d 485, 489 (6th Cir. 2011) (citing Chambers v. NASCO, Inc., 501 U.S. 32, 45-46 (1991); Railway Express, Inc. v.

Piper, 447 U.S. 752, 767 (1980)); see also First Bank of Marietta v. Hartford Underwriters Ins. Co., 307 F.3d 501, 511-512 (6th Cir. 2002). Bad faith, in turn, is associated with conduct that is intentional or reckless. See Schafer v. City of Defiance Police Dep't, 529 F.3d 731, 737 (6th Cir. 2008); United States v. Wheeler, 154 F. Supp. 2d 1075, 1078 (E.D. Mich. 2001) (sanctions under court's inherent authority warranted for reckless or bad-faith conduct, and defining "recklessness" as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care," such that it is "more than mere negligence but less than intent"); accord Long v. Steepro, 213 F.3d 983, 987 (7th Cir. 2000). A party may act in bad faith, for example, if it files a frivolous suit with an improper motive, or if it commits a fraud on the court. Williamson v. Recovery Ltd. P'ship, 826 F.3d 297, 301-302 (6th Cir. 2016); see also Chambers, 501 U.S. at 45-46 (court may impose sanctions if it finds that "fraud has been practiced upon it, or that the very temple of justice has been defiled"); Murray v. City of Columbus, Ohio, 534 F. App'x 479, 484 (6th Cir. 2013) (Bad faith "includes situations where fraud has been practiced upon the court and where a party shows bad faith by delaying or disrupting the litigation.").[6]

If a party has engaged in bad-faith conduct, appropriate sanctions may include the imposition of attorney's fees or the dismissal of the party's claims. Murray, 534 F. App'x at 484. Although the Sixth Circuit has repeatedly emphasized that the court's inherent power to sanction "must be exercised with restraint and discretion," the exercise of such authority is "particularly appropriate for impermissible conduct that adversely impacts the entire litigation."

---

[6] Although Federal Rule of Civil Procedure 60(b)(6) also contemplates situations in which a court may vacate a judgment due to a fraud on the court, the Sixth Circuit has explained that the factor analysis developed around that doctrine is not applicable when a case involves "a court's inherent power to sanction for misconduct in litigation." Williamson, 826 F.3d at 302. The Sixth Circuit has also differentiated bad faith outside the context of frivolousness. See id. at 301-302 (explaining that the three-factor test for frivolousness, as set forth in Big Yank Corp. v. Liberty Mutual Fire Insurance Co., 125 F.3d 308 (6th Cir. 1997), is not applicable in a situation involving a "motion for sanctions against a stonewalling attorney").

Id.; see also First Bank of Marietta, 307 F.3d at 516 (same). Dismissal of an action may be an appropriate sanction when a party has committed a fraud on the court, even if the party has an otherwise meritorious case. See, e.g., Ramirez v. T&H Lemont, Inc., 845 F.3d 772, 782 (7th Cir. 2016), petition for cert. filed, No. 16-1418 (U.S. May 30, 2017); Vargas v. Peltz, 901 F. Supp. 1572, 1582 (S.D. Fla. 1995).

There is a split in the circuits concerning whether fraud on the court must be proven by clear and convincing evidence or by a preponderance of the evidence. Compare Ramirez, 845 F.3d at 778 ("[U]nless the governing statute . . . specifies a higher burden, or the Constitution demands a higher burden because of the nature of the individual interests at stake, proof by a preponderance of the evidence will suffice. . . . [T]he inherent authority to impose sanctions for litigation misconduct is judicially derived and specifies no particular standard of proof. . . . [And] [t]he interests implicated by dismissal of a suit as a sanction for misconduct occurring in civil litigation (including discovery) are not so important as to demand that the facts underlying the dismissal be established by clear and convincing evidence."), with Shepherd v. Am. Broad. Cos., Inc., 62 F.3d 1469, 1476-1478 (D.C. Cir. 1995) (requiring clear and convincing evidence), and Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118 (1st Cir. 1989) (same).

Although the Sixth Circuit has not expressly addressed this particular issue, it appears as though it would likely not require the higher burden of clear and convincing proof. See Williamson, 826 F.3d at 302 (holding that the test used to decide whether a judgment should be vacated for fraud on the court under Rule 60, which requires clear and convincing evidence, "is not applicable in this case because this case involves a court's inherent power to sanction" for bad-faith conduct); but see In re Nat'l Century Fin. Enters., Inc. Fin. Inv. Litig., No. 2:03-md-1565, 2009 WL 87618, at *2 (S.D. Ohio Jan. 8, 2009) (Abel, M.J.) (stating, without citation, that

7

determining "whether a fraud on the Court has been committed requires a fact-intensive inquiry where clear and convincing evidence supports the finding").[7]

Ultimately, this Court must determine whether PHC's use of a fabricated document as an exhibit to its first and second amended complaints, which served as the centerpiece for its claims, amounts to either bad-faith conduct or conduct that is tantamount to bad faith. First Bank of Marietta, 307 F.3d at 517 ("A court may impose sanctions pursuant to its inherent powers only when it finds the action in question was taken in bad faith, or conduct that is tantamount to bad faith."). If the answer is yes, the Court must then consider the appropriate sanction. Id.

In determining both the requisite bad faith of the party and the appropriate sanction, the Court "must comply with the mandates of due process." Chambers, 501 U.S. at 50. There is no requirement that "a full evidentiary hearing be held before imposing sanctions." Metz, 655 F.3d at 491. Due process merely requires that the party receives "fair notice and an opportunity for a hearing on the record." Id. (emphasis in original); see also Ray A. Scharer & Co., Inc. v. Plabell Rubber Prods., Inc., 858 F.2d 317, 321 (6th Cir. 1988) (the district court must "afford the parties concerned in potential sanctions at least minimal procedural protections, including notice and the opportunity to respond or to be heard").

Defendants' motions for sanctions provided PHC with fair notice that the Court may impose sanctions pursuant to the Court's inherent authority. See Metz, 655 F.3d at 491 (party receives fair notice of the possibility of inherent power sanctions when an opposing party files a motion requesting sanctions). PHC also had the opportunity to respond to, and be heard on, the issues of bad faith and sanctions, having filed response briefs (Dkts. 194, 195) and participated

---

[7] Regardless of which rule applies, the Court concludes that PHC's bad-faith conduct has been established.

8

fully during the hearing on the sanctions motions. Therefore, PHC's due process rights have been preserved in this case, and the imposition of sanctions would not violate those rights.

### A. PHC's Bad Faith in Attaching Fabricated Evidence to Amended Complaints

In their motions, Defendants argue that PHC's conduct in creating a fabricated Framework Agreement and relying on it as an exhibit to support its claims amounts to bad faith and a fraud on the court. See generally JAC Motors Mot. for Sanctions at 1, 3-4, 10, 15-22; GreenTech Mot. for Sanctions at 12, 21.[8] The Court agrees.

Although courts have used many definitions of fraud on the court, one common definition is conduct that "set[s] in motion some unconscionable scheme calculated to interfere with the judicial system's ability to adjudicate a matter by improperly influencing the trier or unfairly hampering the presentation of the opposing party's claim or defense." Aoude, 892 F.2d at 1118 (citing cases); see also New York Credit & Fin. Mgmt. Grp. v. Parson Ctr. Pharmacy, Inc., 432 F. App'x 25 (2d Cir. 2011) (same); Almeciga v. Ctr. for Investigative Reporting, Inc., 185 F. Supp. 3d 401, 427 (S.D.N.Y. 2016) ("[T]he essence of fraud upon the Court is when a party lies to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process.").

Courts have routinely held that a party commits a fraud on the court when it fabricates evidence and submits that evidence to the court to support the party's claims. See, e.g., Ramirez, 845 F.3d at 782 ("[F]alsifying evidence to secure a court victory" constitutes a fraud on the court

---

[8] JAC Motors also argues that the Court may use its inherent sanctioning authority to dismiss PHC's claims because the action is frivolous. See generally JAC Motors Mot. for Sanctions at 3, 5, 15. PHC devotes a substantial portion of its response to addressing this frivolousness argument and, in particular, the merits of its claims. See generally PHC Resp. to JAC Motors Mot. for Sanctions at 10-25. Because the Court concludes that PHC engaged in bad-faith conduct by committing a fraud on the court, which is distinct from any sort of purported frivolousness, and that such conduct warrants dismissal of PHC's claims, see infra, the Court refrains from addressing this additional argument.

9

because it "undermines the most basic foundations of our judicial system."); New York Credit & Fin. Mgmt. Grp., 432 F. App'x 25 ("Falsifying evidence is sanctionable conduct. Submitting falsified evidence is also properly sanctionable."); Derzack v. Cnty. of Allegheny, Pa., 173 F.R.D. 400, 412-413 (W.D. Pa. 1996) (collecting cases and holding that evidence fabrication constitutes a fraud upon on the court), aff'd sub nom. Derzack v. Cnty. of Allegheny Children & Youth Servs., 118 F.3d 1575 (3d Cir. 1997) (table); Am. Rena Int'l Corp. v. Sis-Joyce Int'l Co., Ltd., No. CV 12-6972, 2015 WL 12732433, at *23 (C.D. Cal. Dec. 14, 2015) ("[I]t is well-settled that fabricating and submitting knowingly false evidence amounts to willful and bad faith conduct."). In fact, one court has held that a plaintiff's fabrication of an agreement and attaching that agreement to his complaint was a "near-classic example" of fraud on the court. Aoude, 892 F.2d at 1118; see also Stonecreek – AAA, LLC v. Wells Fargo Bank N.A., No. 1:12-cv-23850, 2014 WL 12514900, at *3-4 (S.D. Fla. May 13, 2014) ("Fraud upon the court takes many forms, but the instant case present the near-classic example — fabrication of evidence.").

There is no dispute that the version of the Framework Agreement attached as an exhibit to PHC's first and second amended complaints was not an authentic copy of the Framework Agreement. The evidence in the record clearly and convincingly demonstrates that PHC electronically copied signatures from a different agreement and pasted those signatures into another document that did not contain signatures, and that latter document was then incorporated into the newly fabricated Framework Agreement. The creation of this fabricated agreement was done intentionally and at the behest of Ms. Brown. The fabrication was then attached as an exhibit to PHC's first and second amended complaints. PHC's current counsel (not the former counsel who had attached the fabricated document to the first two amended complaints) admitted that it was a "forged document . . . created at PHC and in PHC's files, 100 percent," and he

10

"wish[ed] more than anything that that document had never been created and never been attached to the complaint." 4/3/2017 Hr'g Tr. at 112 (Dkt. 209); see also id. at 108 ("There was no hiding that it was a forgery . . . .").

According to PHC, its "prior reliance on the copy of the Framework Agreement attached to PHC's initial amended complaints was a mistake" because PHC "believed it was attaching" the "returned [ ] copy of the signed Framework Agreement as part of a packet of documents Ms. Brown brought back from China in early 2011." Pl. Resp. to JAC Motors Mot. for Sanctions at 22-24 (citing WeChat Instant Messages, Ex. 9 to Pl. Resp. to JAC Motors Mot. for Sanctions, at 2-3 (Dkt. 194-11); 11/17/2016 Brown Dep. Tr., Ex. 10 to Pl. Resp. to JAC Motors Mot. for Sanctions, at 49-50, 66-68, 76 (Dkt. 194-12)).[9] PHC further states that it "discovered in September 2016 that the particular copy of the Framework Agreement attached to PHC's initial amended complaints was not authentic," id. at 1 (citing 11/18/2016 Brown Dep. Tr., Ex. 1 to Pl. Resp. to JAC Motors Mot. for Sanctions, at 203-204 (Dkt. 194-3)) (emphasis in original), because "PHC had realized that JAC [Motors] had not returned a copy of that agreement as PHC previously had believed," id. (citing 9/9/2016 Email, Ex. 3 to Pl. Resp. to JAC Motors Mot. for Sanctions (Dkt. 194-5)). The Court finds PHC's "mistaken belief" explanation unavailing and unsupported by the record evidence.

---

[9] See also PHC Resp. to GreenTech Mot. for Sanctions at 1 (Dkt. 195) ("In December 2014, PHC filed a first amended complaint attaching what it believed to be an authentic signed copy of its Framework Agreement with JAC, which it believed had been returned to PHC by JAC in Hefei, China, in January 2011.").

First and foremost, PHC has failed to direct the Court to any record evidence, whether in the form of an affidavit[10] or deposition testimony, that anyone affiliated with PHC believed, at the time the first and second amended complaints were filed, that the attached version of the Framework Agreement was in fact genuine, on the theory that it was the version Ms. Brown purportedly brought back from China in January 2011. In other words, no one from PHC has actually stated under oath that attaching the fabricated agreement to the amended complaints was a mistake. As such, the contention that the filing of the fabricated agreement was a mistake amounts to nothing more than a lawyer's unsworn conclusion.

Second, Ms. Brown was acting as PHC's CEO at the time the first and second amended complaints were filed. PHC has not offered any evidence, let alone suggested, that anyone other than Ms. Brown interfaced with the lawyers who filed these amended complaints. And based on the uncontroverted evidence above, Ms. Brown unquestionably knew that she had commissioned the fabrication of the Framework Agreement in August 2011.

Third, regarding the record evidence PHC did rely on in its briefing, the Court finds that it also does not support PHC's mistaken-belief explanation. For instance, Mr. Brown never testified during his deposition that, at the time the first and second amended complaints were filed, it was the belief of Ms. Brown or any other responsible person at PHC that the attached agreement was authentic. Rather, his deposition testimony demonstrates that he did not know whether or not PHC ever possessed an authentically signed copy of the Framework Agreement. See 11/17/2016 Brown Dep. Tr. at 66 (testifying that he was given a package of materials in January 2011 that contained a signed copy of the 2011 Supplementary Agreement with the

---

[10] Mr. Brown is no stranger to post-motion affidavits to rebut certain factual claims, e.g. 1/19/2017 Brown Aff., Ex. 17 to Pl. Resp. to JAC Motors Mot. for Sanctions (Dkt. 194-19), and yet PHC has not offered any sort of affidavit to support its explanation here.

Framework Agreement attached; and that he was told by someone — an obviously hearsay statement — that the package contained the signed copy of the Framework Agreement, but that he did not go through the materials thoroughly to validate whether or not there was an original signature); id. at 76 (testifying that he was not sure whether PHC ever had an original signed copy of the Framework Agreement). Mr. Brown's testimony does not support the contention that the fabricated agreement was mistakenly attached to the amended complaints.

At best, Mr. Brown merely confirmed that Richard Miller, another PHC employee, testified that he believed that he saw a signed copy of the Framework Agreement when Ms. Brown returned from China in January 2011. See id. at 49-50 (answering in the affirmative when asked whether Miller testified that Ms. Brown "came back with the original signed copies of both the agreement that was signed first on the day and also the agreement that was signed second on the day"); see also Miller Dep. Tr., Ex. 2 to JAC Motors Mot. for Summ. J., at 110-111, 122-123 (Dkt. 144-3). Again, this portion of Mr. Brown's testimony does not support the conclusion that PHC mistakenly believed it was attaching a supposedly authentic agreement, as opposed to a fabricated agreement, at the time the first and second amended complaints were filed. And because the issue here is whether a fabricated agreement was attached to the amended complaints by mistake, and not whether there was a signed copy at some point in PHC's possession, Miller's testimony is irrelevant nonetheless.[11]

PHC also relies on one instant message from Ms. Brown to Alec Chen (JAC Motors' U.S. market manager), sent in December 2014, to support its argument that the fabricated

---

[11] PHC's reliance on Miller's deposition testimony that a signed copy of the Framework Agreement accompanied Ms. Brown following her trip from China is also perplexing, as it stands at odds with PHC's current position that JAC Motors "kept the signed copy of the Agreement." 3d Am. Compl. ¶ 29.

13

agreement was attached by mistake. Again, upon close inspection, this instant message does not support PHC's explanation for its supposedly mistaken use of the fabricated agreement.

In that message, sent on December 26, 2014, Ms. Brown wrote, "I am not worried. I have the signed contract [S]ara [Liu, a JAC employee,] gave me with the supplement that is legally bound on 1/11/2011." WeChat Instant Messages at 2. As with Mr. Brown's testimony, the Court finds that this statement from Ms. Brown does not support PHC's contention that, at the time the first and second amended complaints were filed, PHC attached the fabricated agreement under the mistaken belief that it was an original signed copy of the agreement.[12]

Instead, the evidence is this case clearly shows that Ms. Brown was the CEO of PHC at the time this case was initiated and the first and second amended complaints were filed. Attached to these amended complaints was a fabricated agreement that purportedly established the exclusive relationship between PHC and JAC Motors, which was created by Mitchell and Hayes in August 2011 at the request of Ms. Brown. PHC claims that it attached this fabricated agreement by mistake, but this explanation is completely unsupported by any record evidence. With only a lawyer's unsubstantiated theory offered, the Court finds that PHC's use of the

---

[12] Also of note is that, approximately 13 minutes after that message was sent, Chen asked Ms. Brown if she had "the original signed agreement of 2010," to which Ms. Brown responded, "Yes. Actually, no." WeChat Instant Messages at 3. Ms. Brown also wrote that "[JAC Motors] can make the case about the contract being forged at arbitration court. It will be more favorable to them." Id. Ms. Brown further wrote, "I have the original signed supplement. But, how can I forged it, the signed framework [S]ara [Liu] gave me has 2 signatures, mine and his." Id. Ms. Brown's statement that Liu gave her a signed contract is also substantially undermined when considered together with Ms. Brown's email to Chen, sent only a few weeks earlier, in which she proclaimed that "these documents were given to Michael Qian Yang and me at the meeting of 1/11/2011 with Sara Liu. [T]he original signed agreements are kept in our file." 12/4/2014 Email, Ex. 25 to JAC Motors Mot. for Summ. J. (Dkt. 145-9). However, the PDF document attached to that email included the Supplementary Agreement and the fabricated Framework Agreement. Compare id. at 3-14 (cm/ecf pages) with Framework Agreement, Ex. A to 2d Am. Compl. The weakness is compounded by Ms. Brown's suggestion of conceivably forged documents and her admission, in the December 2014 instant message, that she did not have "the original signed agreement of 2010."

fabricated agreement was either intentional or, at the very least, unquestionably reckless, such that its conduct was tantamount to bad faith.

In an attempt to mitigate any apparent wrongdoing associated with attaching a fabricated agreement to its pleadings and claiming that it was a true and correct copy of the parties' agreement, PHC does state that, "without any prompting by Defendants, PHC learned of an issue in its complaint, promptly informed Defendants of that issue, and promptly corrected that issue by amending its allegations to conform to the evidence in this case." Pl. Resp. to JAC Motors Mot. for Sanctions at 2. However, although PHC affirmatively removed the offending document when it filed its third amended complaint in September 2016, nearly two years after the case was initially filed, PHC's conduct was not entirely altruistic. PHC never informed Defendants that its version of the Framework Agreement was a fabrication. Nor did PHC inform the Court that the version of the Framework Agreement attached to its earlier complaints was a fabrication, or explain why a fabricated agreement was attached to its amended complaints in the first place. And PHC never explains in its response briefs exactly how it discovered in September 2016 that the agreement had been fabricated.

Finally, to the extent PHC is suggesting that Defendants were not harmed or prejudiced by PHC's prior reliance on the fabrication, the record evidence shows that PHC emailed the fabricated Framework Agreement to GreenTech on November 12, 2014 (approximately one month before it was filed under seal with the first amended complaint) to demonstrate that PHC and JAC Motors had an exclusive relationship. See 11/12/2014 Email, Ex. C to GreenTech Mot. for Sanctions (Dkt. 165-4). Upon receipt of that fabrication, GreenTech immediately terminated its business relationship with JAC Motors. See 11/12/2014 Termination Email, Ex. 7 to JAC Motors Mot. to Amend Counterclaim (Dkt. 140-8) ("PHC's lawyer today produced a signed

Framework Agreement that is very different from the agreement JAC gave us. . . . With PHC's agreement having been furnished, I do not think we can move ahead safely with the JAC transaction during the remaining one year of that agreement[.]"). Thus, PHC's use of the fabrication was not innocent, as it claims, because its use during the pendency of this case had the real-world consequence of ending Defendants' business relationship.

Therefore, the Court concludes that PHC has engaged in bad-faith conduct in this case.

**B. Dismissal of Claims is an Appropriate Sanction for PHC's Bad-Faith Conduct**

In their motions, Defendants further argue that PHC's bad-faith conduct warrants the dismissal of PHC's claims. See generally JAC Motors Mot. for Sanctions at 15-22; GreenTech Mot. for Sanctions at 12, 21. Again, the Court agrees.

Sanctions for "violations of the judicial process" serve not only to "remedy prejudice to a party" and "reprimand the offender," but also to "deter future parties from trampling upon the integrity of the court." Salmeron v. Enter. Recovery Sys., Inc., 579 F.3d 787, 797 (7th Cir. 2009). Although dismissing a party's claims is a "particularly severe sanction," it is within the Court's discretion to determine whether it is appropriate in this case. Chambers, 501 U.S. at 44-45; see also Projects Mgmt. Co. v. Dyncorp Int'l LLC, 734 F.3d 366, 373 (4th Cir. 2013) ("A court's inherent power includes the ability to order the dismissal of a case, though such orders must be entered with the greatest caution.").

"[A] court's inherent power to dismiss a case and protect the sanctity of the judicial process is never more compelling than in a situation of individuals who engage in fraud upon the court." Perna v. Elec. Data Sys., Corp., 916 F. Supp. 388, 397 (D.N.J. 1995); see also United States v. Shaffer Equip. Co., 11 F.3d 450, 462 (4th Cir. 1993) ("[W]hen a party deceives a court or abuses the process at a level that is utterly inconsistent with the orderly administration of

justice or undermines the integrity of the process, the court has the inherent power to dismiss the action . . . ."); Aoude, 892 F.2d at 1119 ("We find the case[ ]law fully consonant with the view that a federal district judge can order dismissal or default where a litigant has stooped to the level of fraud on the court."); Wyle v. R.J. Reynolds Indus., Inc., 709 F.2d 585, 589 (9th Cir. 1983) ("[C]ourts have inherent power to dismiss an action when a party has willfully deceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice."); McMunn v. Mem'l Sloan-Kettering Cancer Ctr., 191 F. Supp. 2d 440, 461 (S.D.N.Y. 2002) ("[D]ismissal is a harsh sanction to be used only in extreme situations. When faced with a fraud upon the court, however, such [a] powerful sanction is entirely appropriate."). Not surprisingly, case law is replete with instances where a district court dismissed an action with prejudice upon finding that a party fabricated evidence and presented that evidence to the court in support of its claims. See, e.g., Aoude, 892 F.2d at 1122 (upholding the district court's dismissal with prejudice where the plaintiff attached a fabricated document to his complaint); Am. Rena Int'l Corp., 2015 WL 12732433, at *47; Stonecreek, 2014 WL 12514900, at *3-4.

To ensure the integrity of the judicial process and deter future parties from engaging in similarly egregious conduct, the Court concludes that PHC's use of fabricated evidence in this case warrants dismissal of its claims with prejudice. PHC's argument that it still has a meritorious case despite its prior use of the fabricated agreement does not alter this conclusion. See Ramirez, 845 F.3d at 782 (district court, which "expressly assumed" that the plaintiff "may have had a meritorious case," did not abuse its discretion in dismissing the action with prejudice based on plaintiff's witness tampering); Vargas, 901 F. Supp. at 1582 ("Federal courts have the

inherent power to dismiss an action for misconduct that abuses the judicial process and threatens the integrity of that process — including misconduct unrelated to the merits of the case.").[13]

---

[13] PHC also contends that Defendants' motions for sanctions should be construed as dispositive motions pursuant to Local Rule 7.1, because they seek the "involuntary dismissal of all of PHC's claims." Pl. Resp. to JAC Motors Mot. for Sanctions at 9; Pl. Resp. to GreenTech Mot. for Sanctions at 8; see also E.D. Mich. LR 7.1(e)(1)(A) ("Dispositive motions" include motions "to involuntarily dismiss an action."). PHC then argues that the motions should be denied because they were filed after the deadline for dispositive motions, as set forth in the Court's scheduling order, and there is no good cause for an extension. See generally Pl. Resp. to JAC Motors Mot. for Sanctions at 7-9; Pl. Resp. to GreenTech Mot. for Sanctions at 6-9; see also 9/26/2016 Stip. & Order (setting deadline for dispositive motions for December 19, 2016). The Court finds these arguments unavailing for four reasons.

First, as one eminent judge in this district has previously recognized, "there is no local rule governing the filing of a motion for sanctions." Dubuc v. Green Oak Twp., no. 08-13727, 2010 WL 3245324, at *3 (E.D. Mich. Aug. 16, 2010), aff'd, 482 F. App'x 128 (6th Cir. 2012), cert. denied, 133 S. Ct. 683 (2012). Instead, the appropriate test to employ in this circumstance is one of "reasonableness," which "asks whether the delay causes (1) unfair surprise; (2) prejudice to the affected; or (3) piecemeal appeals." Id. (citing In re Ruben, 825 F.2d 977, 981-982 (6th Cir. 1987)). PHC does not argue that allowing the filing of the sanctions motions would be unreasonable. But even if it did, the Court finds that there is no evidence of an unfair surprise, as PHC itself admits that it knew about the fabrication in September 2016. Nor is there any prejudice to PHC, which responded to the arguments raised in the motions and fully participated during the hearing. Last, there is no concern for piecemeal appeals in this case.

Second, Local Rule 7.1's inclusion of a motion that seeks to "involuntarily dismiss an action" as an example of a dispositive motion should be read in conjunction with Federal Rule of Civil Procedure 41. According to section (b) of Rule 41, which is entitled "Involuntary Dismissal; Effect," if the plaintiff "fails to prosecute or to comply with these rules or a court order, a defendant may move to dismiss the action or any claim against it." Fed. R. Civ. P. 41(b). Defendants' motions for sanctions are not seeking the involuntary dismissal of the action based on PHC's failure to prosecute or comply with either the federal rules or an order of the Court, as contemplated by Rule 41(b). Rather, the motions are requesting dismissal as simply one of the many options at the Court's disposal when determining which sanction is most appropriate given PHC's bad-faith conduct.

Third, assuming every motion for sanctions that requests dismissal amounts to a dispositive motion under Local Rule 7.1, the Court has the broad discretion to exercise its inherent authority to sanction a party for bad-faith conduct at any time during the case. See Dubuc, 482 F. App'x at 133 n.3 ("Courts have great discretion in determining when to impose sanctions." (emphasis added)). The Court is exercising that discretion here.

18

## III.  CONCLUSION

For the reasons stated above, the Court grants Defendants' motions for sanctions (Dkts. 163, 165) and dismisses PHC's claims with prejudice.

SO ORDERED.

Dated:  June 30, 2017　　　　　　　　　　　　s/Mark A. Goldsmith
  Detroit, Michigan　　　　　　　　　　　　　MARK A. GOLDSMITH
　　　　　　　　　　　　　　　　　　　　　　United States District Judge

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on June 30, 2017.

　　　　　　　　　　　　　　　　　　　　　　s/Karri Sandusky
　　　　　　　　　　　　　　　　　　　　　　Case Manager

---

Fourth, courts have broad discretion to modify the dates established in scheduling orders. Kimble v. Hoso, 439 F.3d 331, 336 (6th Cir. 2006) ("[D]istrict courts ordinarily enjoy broad discretion in matters of pretrial management, scheduling, and docket control.").

Therefore, for all of these reasons, the Court rejects PHC's argument that Defendants' sanctions motions should be denied on the theory that they were filed after the deadline for dispositive motions.